LINUS L. BAKER MO 44980
6732 WEST 185TH TERRACE
STILWELL, KANSAS 66085
913.486.3913
LINUSBAKER@PRODIGY.NET
*Attorney for Diane Meadows*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

**Diane Meadows**

Plaintiff

v.

Case No.

**North American Savings Bank**

Defendant

## COMPLAINT

COMES NOW PLAINTIFF Diane Meadows, by her undersigned attorney, for her complaint against the defendant North American Savings Bank. The plaintiff seeks nominal, actual and punitive damages in fair and reasonable amounts, costs, attorney fees, expenses, interest, reinstatement, and further legal and equitable relief the Court may grant to remedy Defendant's unlawful acts. The plaintiff alleges as follows:

## NATURE OF THE ACTION

**1.** The plaintiff Diane Meadows was employed at North American Savings Bank (NASB or the Bank) as an office assistant on January 6, 2020. At that time there was no requirement placed upon Ms. Meadows, as part of her job description, to disclose her immunity status or consent to unwanted medical procedures.

**1**

**2.** NASB changed the conditions of Ms. Meadows' employment by enacting a requirement that she subject herself to multiple and unwanted gene therapy injections ("vaccines" or "the Injections"). NASB terminated Ms. Meadows' employment on December 1, 2021, and according to NASB, it was because of Ms. Meadows' immunity status.

**3.** The COVID-19 vaccination status of NASB employees is irrelevant to mitigating the risks of transmission of COVID-19. Vaccinated and unvaccinated employees transmit COVID-19 at roughly the same rate. No evidence proves otherwise. Any risks, therefore, posed by unvaccinated employees such as the plaintiff mirror those posed by vaccinated employees.

**4.** The Injections are not vaccines, as that term has traditionally been understood, but are, as a factual matter, medical treatments. Indeed, the CDC even recently changed its own definitions of "Vaccine" and "Vaccination" to eliminate the word, "immunity."

84. Immunity is the *sine qua non* of all vaccines.

**5.** Ms. Meadows was presented with a Hobson's choice between "their job(s) and their jab(s)." *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021).

**6.** "At the risk of belaboring the obvious, Title VII aimed to ensure that employees would not have to sacrifice their jobs to observe their religious practices." *Adeyeye v. Heartland Sweeteners*, 721 F.3d 444, 456 (7th Cir. 2013).

**7.** NASB has never required vaccinations for Hepatitis B, Pertussis, or other communicable diseases; nor have they required disclosure of vaccination status as part of their Occupational Safety and Health Act compliance plan. Yet despite these facts, NASB has never been cited or faced an enforcement action under the Occupational Safety and Health Act due to the vaccination status of their employees or their vaccination policies.

**8.** Tellingly, NASB failed to explain in its EEOC charge response why it delayed imposing its mandate for 11 or 18 months in the face of a supposed compelling necessity of protecting workplace safety.

**9.** NASB claimed there was a legal liability in permitting Ms. Meadows to continue to be employed without a Covid-19 vaccine injection. NASB contends that it would not be compliant with OSHA in permitting Ms. Meadows to remain employed in an "unvaccinated" status. OSHA does regulate certain diseases as hazards, but no regulation cited by NASB requires vaccination. See 29 C.F.R. § 1910.502 (COVID-19 protocols).

**10.** NASB also contends it would be out of compliance with the Americans with Disabilities Act because of Ms. Meadows' immunity status. Contrary to NASB's pretextual goal of OSHA "workplace safety," NASB was never subjected to any legal liability regarding the immunity status of its employees. There was no legitimate business justification for NASB's actions. As has been seen with other employers, the "real reason for the vaccine mandate...was 'virtue signaling' and 'currying political

favor.'" *Sambrano v. United Airlines*, 45 F.4th 877, 879 (5th Cir. 2022) (Ho, J., concurring in denial of rehearing en banc); see also *Louisiana v. Becerra,* 2021 WL 5609846, at *14 (W.D. La. Nov. 30, 2021)("Although CMS spent pages and pages attempting to explain the need for mandatory COVID-19 vaccines, when … millions of people have already been infected, developing some form of natural immunity, and when people who have been fully vaccinated still become infected, mandatory vaccines as the only method of prevention make no sense").

**11.** Reliable scientific data establishes that prior infection is likely thirteen times more effective than vaccination alone in preventing reinfection and/or breakthrough infection.[1]

**12.** While this case implicates the Bank's factual and legal justifications for its mandate, putting that aside, this case is about whether NASB could have accommodated sincerely held religious beliefs when it was within the Bank's power to do so at little to no cost. After all, a company's advertising or virtue signaling goals are not permitted to trump Title VII.

**13.** This is an action for religious discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., on the grounds that Defendant failed to reasonably accommodate the plaintiff's sincerely held religious objection to a mandatory consent-to-COVID-19-injections policy which required her to consent to vaccine injections, wrongly denied her requested religious exemption, and as a result

---

[1] https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1.

illegally terminated her employment. Plaintiff asserts a concurrent claim under the Missouri Human Rights Act (R.S.Mo. Ch.213) for failure to accommodate her disability and failure to religiously accommodate her.

**14.** By this action, the plaintiff seeks all legal and equitable relief available, including reinstatement, back pay, front pay, lost future earnings, out of pocket costs, compensatory damages, punitive damages, and attorney's fees and costs. Plaintiff demands trial by jury.

**PARTIES**

**15.** Plaintiff Diane Meadows is an adult resident of Blue Springs, Missouri. At all relevant times, Meadows was an "employee" of NASB within the meaning of Title VII and applicable state law.

**16.** Defendant NASB is a domestic corporation with its principal place of business at 937 N.E. Columbus Drive Lee's Summit, Missouri 64086 and 903 E. 104th Street, Kansas City, Missouri 64131. At all relevant times, NASB had more than 500 employees. At all relevant times, NASB was the plaintiff's "employer" within the meaning of Title VII and applicable state law.

**JURISDICTION AND VENUE**

**17.** This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 42 U.S.C. § 2000e-5(f)(3) (Title VII).

**18.** This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, because Plaintiff's federal and state law claims derive

5

from a common nucleus of operative facts and form part of the same case or controversy under Article III of the U.S. Constitution.

**19.** This Court has venue over this action pursuant to 28 U.S.C.§§ 1391(b)(1) and (b)(2) and 42 U.S.C. § 2000e-5(f)(3) (Title VII), because Defendant resides in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## ADMINISTRATIVE EXHAUSTION

**20.** Plaintiff properly exhausted her administrative remedies under Title VII prior to filing this action.

**21.** Within 180 days of the alleged discriminatory acts, Meadows filed a charge of discrimination against NASB with the MCHR. The charges were assigned charge numbers E-04/22-53946 (MCHR) and 28E-2022-00867 (EEOC).

**22.** On November 2, 2022, the MCHR issued a Notice of Right to Sue.

**23.** This action was filed within 90 days of Meadows's receipt of the Notice of Right to Sue.

## ALLEGATIONS

**24.** At all relevant times, Diane Meadows was qualified for her employed position with NASB and performed her duties in a satisfactory manner.

**25.** NASB's workplace safety justification for its mandate has no merit because:

  a. The overwhelming evidence shows that the Covid 19 Injections are not vaccines but gene therapy and do not prevent transmission, infection, or reinfection in those who consent to receive them.

**6**

b.  The CDC Director has admitted that the Injections do not prevent infection or transmission of SARS-CoV-2, the virus that has been identified by various public health agencies as causing the disease known as COVID-19.

c.  The CDC has acknowledged that the "vaccinated" and "unvaccinated" are equally likely to spread the virus.

26. The mRNA platform is not a vaccine, but rather gene therapy in the form of biological "software" designed to genetically "hack" the machinery of human cells to create a specific protein that genetically modifies human cells.[2]

27. The specific protein that human cells are "hacked" to create is the spiked protein of the disease itself. The Injections genetically modify human cells to create the same toxic protein that the disease itself creates – the spiked protein. These spiked proteins adhere to the endothelial cells of humans, the very cells that line the entire cardiovascular system. The spike proteins adhere to the interior of the cardiovascular system like thorns on a rose bush, causing a variety of detrimental effects, the short- and long-term impact of which are currently unknown and unknowable.

28. When NASB announced its vaccine mandate, it stated that employees could request accommodations for religious or health reasons. This is in line with Equal Employment Opportunity Commission ("EEOC") guidance on private employers

---

[2] Banoun, Helene. Current state of knowledge on the excretion of mRNA and spike produced by anti-COVID-19 mRNA vaccines; possibility of contamination of the entourage of those vaccinated by these products. November 2022.

issuing such mandates.  *See* What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws §§ K.1 & K.2., EEOC (May 28, 2021).

**29.**  NASB's announcement was illusory for religious employees.

**30.**  NASB's Covid-19 policy was facially contrary to Title VII.  It stated that it would only provide a reasonable accommodation "that enables the employee to perform the essential functions of his or her position, without imposing undue hardship on the Bank, and without the employee posing a direct threat to the health or safety of the employee or others."[3]  This added ADA requirement implicitly asserts that Ms. Meadows has a disability under 42 U.S.C. §12102(1)(C)(3)(A)-(B) but that NASB has a defense to discriminating against that disability under the ADA.

**31.**  The crux of NASB's termination reasoning comes under the "qualified individual" element in an ADA case which NASB is heard to claim that Ms. Meadows cannot perform the essential functions of her position because she poses a direct threat to the safety of other individuals in the workplace.

**32.**  Put another way, the policy and Ms. Meadows' termination regarded a "qualified individual with a disability" but would be justified "if she poses a direct threat to the health or safety of other individuals in the workplace." 42 U.S.C. § 12113(b); *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1094 (5th Cir. 1996)).

---

[3] NASB is capturing that language from Americans with Disabilities Act of 1990, 42 U.S.C. §§12101 et seq. ("ADA").

**33.** NASB's mismatch of statutes incorporating the ADA analysis is of NASB's own making. So NASB theorizes it has a defense to a charge of discrimination for qualifications standards, that otherwise deny a job or benefit to an individual with a disability, which are shown to be job-related and consistent with business necessity. 42 U.S.C. §12113(a). Under the ADA, "qualification standards" may include a requirement that an individual shall not pose a direct threat to health or safety of other individuals in the workplace." 42 U.S.C. §12113(b),

**34.** NASB's covid-19 policy and its termination of Ms. Meadows because of her immunity status is indeed pointing to Ms. Meadows' medical condition – her vaccine immunity status. Under the ADA, where "the perceived threat to safety arises from an employee's medical condition, determination of whether that condition constitutes a direct threat "shall be based on reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence." 29 C.F.R. §1630.2(r)). "The employer bears the burden of proving that an employee … poses a direct threat." *EEOC v. Hussey Copper Ltd.,* 696 F.Supp. 2d 505, 520 (W.D.Pa. 2010).

**35.** When NASB terminated Ms. Meadows, it did not have any documentation concerning defining or analyzing Ms. Meadows' risk to other employees or customers, the duration of the risk, the nature and severity of the potential harm, the likelihood that the potential harm will occur; or the imminence of the potential harm. *See* 29 C.F.R. §1630.2(r).

**36.** When NASB terminated Ms. Meadows, it had not obtained a health care professional to specifically assess Ms. Meadows' purported safety risk to any coworkers or customers based on the objective, scientific information available to that professional or others in that profession.

**37.** When NASB terminated Ms. Meadows, it had no reasonable medical judgment that evaluated Ms. Meadows' immunities and one which relied on the most current medical knowledge and/or the best available objective evidence that Ms. Meadows' immunity status posed any threat to the safety of any customer or fellow employee.

**38.** Under Title VII, there is no undue-hardship-*plus* exception. In fact, NASB claimed that posing a health threat to customers and co-employees was the purported undue hardship which is not a legitimate Title VII analysis. NASB rejected Ms. Meadows' religious accommodation request stating this:

> Specifically, working in your position while unvaccinated creates an undue hardship because it would jeopardize and threaten the health and safety of NASB's employees and customers. It is well known that vaccination provides a significant degree of protection against the spread of Covid-19 and is a significant protection against severe illness and death that could result from transmission of the virus. Therefore, based on the nature of your position's job duties and the high degree of personal interaction involved in your position, working without being vaccinated would create a significant risk of transmitting Covid-19 to employees and customers of NASB. Not only would this place an undue hardship on NASB, but NASB is also required by law to provide employees with a place of employment that is free from recognized hazards that are likely to cause serious harm or death.

**39.** Nothing in that statement is legally or factually correct. If OSHA's existing regulations required COVID-19 vaccinations then OSHA wouldn't have needed to issue an Emergency Temporary Standard which was immediately enjoined by the

Fifth Circuit. *See BST Holdings, L.L.C. v. OSHA*, 2021 U.S. App. LEXIS 33698 (5th Cir. 2021). "Vaccinations" do not prevent the spread of the Covid-19 virus, do not promote workplace safety, and NASB is not required by OSHA or any state or federal law to require its employees to consent to vaccine injecting.

**40.** The Injections are not effective against the Omicron variant of SARS-CoV-2 in that they do not prevent the recipient from becoming infected, getting reinfected, or transmitting SARS-CoV-2 to others. Evidence shows that the vaccinated contain greater amounts of SARS-CoV-2 in their nasal passages than the unvaccinated.

**41.** NASB was concerned about its reputational image in the industry, though. Evidently, NASB believed other companies would think less of the Bank if it employed unvaccinated religious individuals and so it took steps to rid itself of as many disfavored religious employees as it could if they had what NASB determined to be an "illegitimate" reason for not consenting to the vaccine injections.

**42.** The illogic of the policy is further demonstrated. NASB employees able to comply with the Bank's mandate were vaccinated with either the Pfizer, Moderna, or Janssen vaccine. Because many NASB employees would have taken a COVID-19 vaccine long before the Bank's mandate, some of those individuals had not received a vaccine in more than six months (the efficacy waned and therefore *more* susceptible to infection than unvaccinated employees) when unvaccinated employees were put out of work.[4]

---

[4] Additional studies have also shown that the vaccines forced on NASB employees wane significantly over time. Not only has this been confirmed by the CDC, one study showed Pfizer and Moderna efficacy dropping from 6% effectiveness against the

Yet this made sense to NASB that those vaccinated employees with diminished or no vaccine efficacy did not present a workplace safety issue.

**43.** Putting aside the fact that Ms. Meadows did not present any greater workplace safety risk than any other "vaccinated" employee, NASB could have accommodated her without undue hardship effortlessly through mitigation of symptomatic, masking/testing of everyone or even the recognition of natural immunity, remote work, or any combination of these options.

**44.** The NASB policy created two classes of employees; injected and uninjected. The members of one class, the uninjected, get terminated. The uninjected cannot advance their careers. They cannot provide for their families, pay their mortgages, or make a car payment. The other class, the vaccinated, get to keep their job in their chosen profession, advance their careers, provide for their families, pay their mortgages, and make their car payments.

**45.** Yet the situations of these employees are indistinguishable because injected NASB employees can become infected with SARS-CoV-2, become re-infected with SARS-CoV-2, and can transmit SARS-CoV-2 to fellow workers and customers –

---

Omicron variant in the first two months to -39% at 4 months and -42% at 6 months. Sarah A. Buchan, et al., Effectiveness of COVID-19 vaccines against Omicron or Delta infection, MEDRXIV [preprint] (Jan. 1, 2022), https://www.medrxiv.org/content/10.1101/2021.12.30. 21268565v1 Another study showed a -76.5% efficacy for Pfizer and a -39.3% efficacy for Moderna against the Omicron variant. Christian Holm Hansen, et al., Vaccine effectiveness against SARS-CoV-2 infection with the Omicron or Delta variants following a two-dose or booster BNT 162b2 or mRNA-1273 vaccination series: A Danish cohort study, MEDRXIV, https://www.medrxiv.org/content/10.1101/2021.12.20.21267966v3

studies indicating they are more likely to do so. The Injections make no difference in those respects. Their only purported function supported by science is to make symptoms less severe for the injected person.

**46.** So the Bank wanted to brand itself as "fully vaccinated" as a signal to other companies, even if that meant trampling on its religious employees' Title VII rights. Moreover, demonstrating the pretextual nature of NASB's vaccination strategy, NASB's definition of "fully vaccinated" was only that someone take a primary series of the vaccine – not a step that would actually make someone "fully vaccinated." The mandate was about virtue signaling and ridding itself of disfavored religious employees more than the safety of employees or customers.

**47.** NASB seemed to view CDC "guidance" as its polestar. NASB claimed in its policy that it was not requiring "boosters" but might require "boosters" in the future based upon CDC "guidance." But at the time NASB created its policy, CDC guidance and other studies acknowledged that vaccine injections did not hinder the transmission of the SARS virus at all.

**48.** As to safety, NASB made OSHA its linchpin of terminating Ms. Meadows' employment. NASB claimed that Ms. Meadows presented an OSHA workplace risk.[5] But despite the vaccination mandate being aimed at increased safety, curiously the Bank did not mitigate or otherwise require regular testing – the most reliable

---

[5] It was, according to NASB, Meadows' immunity status that purportedly "would jeopardize and threaten the health and safety of NASB's employees and customers due to her position involving in-person interaction with customers and employees."

protection against the spread of the virus, especially since it was widely known during the relevant timeframes that vaccinated individuals could contract and transmit COVID.[6]

49. Theoretically, being injected with a Covid-19 vaccine does not, in and of itself, purport to make anyone "safer." Put another way, vaccination status doesn't necessarily mean anything in terms of any so called workplace safety. Thus, the act of being injected is meaningless: being injected with a saline solution does not magically protect anyone. Rather, it is the purported artificially induced immunity that is at issue. And to the extent the efficacy of a vaccine dissipates over time, the Bank took no steps to evaluate anyone's actual immunity levels.

50. The Bank's workplace safety issue is premised on the plaintiff's immunity status – specifically not being vaccine injected with Covid-19 vaccine(s) – created an unsafe working environment. Ms. Meadows' immunity status could not, was not, and is not, a workplace risk as alleged by NASB.

51. When the U.S. Supreme Court stayed the Occupational Safety and Health Administration's Emergency Temporary Standard – requiring all employers with at least 100 employees to ensure their workforces are fully vaccinated for COVID-19 – it rejected the argument that the generic risk of contracting COVID-19 qualifies as a

---

[6] And NASB's mandate does not require booster shots, despite the CDC's plain recommendation that individuals take boosters to be "up to date" on their vaccinations (i.e. actually "fully vaccinated").

**14**

"work related danger." *NFIB v. DOL*, 142 S. Ct. 661, 665 (2022).[7] Recently, the Ninth Circuit rejected an agency's "broad interpretation of its existing regulations as applying generally to COVID hazards in the workplace." *Flower World, Inc.*, 2022 U.S. App. LEXIS at *17 (9th Cir. Aug. 11, 2022).

52. To the point: submitting to a Covid-19 vaccine is not workplace conduct subject to OSHA as held by the Supreme Court in *Nat'l Fed'n Indep. Bus. v. OSHA*, 595 U.S. ___ (2022).

53. Consequently, the legal citation to OSHA is fatally flawed because the Occupational Safety and Health Act of 1970, 29 U.S.C. § 15 et seq., only allows OSHA "to set workplace safety standards" but "not broad public health measures" such as vaccine mandates as cited by NASB.

54. And in *NFIB*, the Supreme Court specifically held that COVID-19 is not a workplace risk, but rather a "universal risk" that is "no different from the day-to-day dangers that all face from crime, air pollution, or any number of communicable diseases." *NFIB*, 595 U.S. ___ slip op. at 6. Accordingly, *NFIB* held, requiring employees to get vaccinated against COVID-19 is outside OSHA's ambit.

---

[7] "OSHA typically identifies a workplace danger and then regulates it. But, here, President Biden decided to regulate a danger and then told OSHA to find a work-related basis for doing so. This resulted in the vaccine mandate, a blunderbuss rule, nationwide in scope, that requires the same thing of all covered employers, regardless of the other steps they've taken to protect employees, regardless of the nature of their workplaces, regardless of their employees' risk factors, and regardless of local conditions that state and local officials are far better positioned to understand and accommodate."

15

**55.** NASB's factual premise that "vaccination provides a significant degree of protection against the spread of Covid-19" was factually wrong and contrary to science and studies.

**56.** Not only is NASB's OSHA-safety premise flawed, so too the factual underpinning for the purported workplace safety issue. NASB invoked OSHA to support its undue hardship / workplace safety claim. But that was built upon the mythical and conjured conclusion that a Covid-19 vaccine would prevent the transmission of the Covid-19 virus (which it never did and currently does not according to the most recent studies and findings).

**57.** Not only did the vaccines never prevent transmission, their purported efficacy to diminish virus symptoms is actually 180 degrees opposed to NASB's policy according to statistics. Now, the more people get Covid-19 vaccinated, they make up a greater proportion of fatalities.[8]

**58.** Bottom line is this: being Covid vaccine injected increases the likelihood of death. Current statistics now reveal that the real pandemic is of the "vaccinated" according to a study cited in the Washington Post in which an analysis conducted by the Kaiser Family Foundation demonstrated that in January and February of 2022 up to 42

---

[8] https://www.dailymail.co.uk/health/article-11466261/Majority-Covid-deaths-vaccinated-Americans-time.html

percent of deaths were for the vaccinated. It has now increased to 58% as of August of this year and continues to climb.[9]

**59.** Yet just before the Bank published its October 2021 Covid-19 policy to require Covid-19 vaccine injections, the U.S. Centers for Disease Control and Prevention ("CDC") Director, Dr. Rochelle Walensky, stated on October 8, 2021, about COVID-19 vaccines that the vaccines never prevented transmission: "what they cannot do any more is prevent transmission."[10]

**60.** At the time of the Bank's denial of religious exemptions, the FDA acknowledged that while it was hoped that the COVID-19 vaccines would reduce or prevent the transmission of the virus, "the scientific community does not yet know if the COVID-19 Vaccines will reduce such transmission."[11]

**61.** A CDC study released in January 2022 not only demonstrated that vaccination provides no discernible benefit to the naturally immune, but it provided conclusive evidence that naturally acquired immunity confers superior protection against the Delta variant (including against transmission).[12]

---

[9] https://www.washingtonpost.com/politics/2022/11/23/vaccinated-people-now-make-up-majority-covid-deaths/

[10] CDC Director, Dr. Rochelle Walensky, Oct. 8, 2021, available at: https://youtu.be/swlUv2SbmT8.

[11] *See, e.g.,* Pfizer-BioNTech COVID-19 Vaccine Frequently Asked Questions, Food and Drug Administration, available at: https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/pfizer-biontech-covid-19-vaccine-frequently-asked-questions.

[12] Tomás M. León et al., COVID-19 Cases and Hospitalizations by COVID-19 Vaccination Status and Previous COVID-19 Diagnosis—California and New York,

**62.** But even under the CDC guidance when NASB enacted its Covid policy, CDC issued revised guidance during that time period due to new data "that the Delta variant was more infectious and was leading to increased transmissibility when compared with other variants, even in some vaccinated individuals."[13]

**63.** As of October 27, 2021, the CDC's "Nowcast" model which tracked proportions of circulating variants in the United States reported that the Delta variant comprised 99.6% of the variants recently detected throughout the U.S.[14]

**64.** It was well understood from October 2021 when NASB published its vaccine mandate that the Delta variant was "spreading in settings where there is high vaccine coverage."[15]

**65.** These studies indicated that vaccinated individuals were susceptible to infection with the Delta variant and presented a risk of transmitting SARS-CoV-2 to others.[16]

---

May-November 2021, CDC (Jan. 29, 2022), available at https://www.cdc.gov/mmwr/volumes/71/wr/ mm7104e1.htm (last visited June 29, 2022) ("infection-derived protection was greater after the highly transmissible Delta variant became predominant, coinciding with early declining of vaccine-induced immunity").

[13] "Science Brief: COVID--19 Vaccines and Vaccination," CDC website (updated Sept. 15, 2021), available at: https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/fully-vaccinated-people.html.

[14] CDC COVID-19 Data Tracker, Variant Proportions, CDC website (for week ending Oct. 23, 2021), available at: https://COVID-19.cdc.gov/COVID-19-data-tracker/#variant-proportions.

[15] "Vaccinated and unvaccinated individuals have similar viral loads in communities with a high prevalence of the SARS-CoV-2 delta variant," University of Wisconsin (July 31, 2021) ("University of Wisconsin Study") at 1; available at: https://www.medrxiv.org/content/10.1101/2021.07.31.21261387v1.

[16] University of Wisconsin Study at 2-3.

**18**

**66.** The researchers in a University of Wisconsin Study within the relevant time frame concluded that, "a substantial proportion of individuals with SARS-CoV-2 vaccine breakthrough infections during [their] study period ha[d] levels of SARS-CoV-2 RNA in nasal secretions . . . consistent with the ability to transmit the virus to others."[17]

**67.** NASB also ignores Meadows' own personal safety under its invocation of OSHA workplace safety / hardship argument.

**68.** The long-established CDC database VAERS (Vaccine Adverse Events Reporting System) demonstrates significantly higher reports of deaths and adverse events with the Injections than with prior vaccines.[18] There were reports of neurological adverse events, including Guillain-Barre, Bell's Palsy, Transverse Myelitis, Paralysis, Seizure, Stroke, Dysstasia, Aphasia, and Tinnitus, as well as cardiovascular events such as clot and cardiac arrest.

**69.** The latest peer reviewed study SERIOUS ADVERSE EVENTS OF SPECIAL INTEREST FOLLOWING MRNA COVID-19 vaccination IN RANDOMIZED TRIALS IN ADULTS AUGUST 31, 2022

https://www.sciencedirect.com/science/article/pii/S0264410X22010283 include

---

[17] *Id.* at 2.
[18] Rose, J. Critical Appraisal of VAERS Pharmacovigilance: Is the U.S. Vaccine Adverse Events Reporting System (VAERS) a Functioning Pharmacovigilance System? SCIENCE, PUBLIC HEALTH POLICY, AND THE LAW, Vol. 3:100-129 (Oct 2021).

researchers from Stanford University, the University of Maryland, and UCLA. The study provides the following list of confirmed adverse events (or side effects) of the respective mRNA vaccines. It also provides the risk ratios versus Covid-19 (over 1 is a factor increase, under 1 is a factor decrease).

- "In July 2021, the FDA reported detecting four potential adverse events of interest: pulmonary embolism, acute myocardial infarction, immune thrombocytopenia, and disseminated intravascular coagulation following Pfizer's vaccine based on medical claims data in older Americans…. Three of these four serious adverse event types would be categorized as coagulation disorders, which is the Brighton AESI category that exhibited the largest excess risk in the vaccine group in both the Pfizer and Moderna trials."
- "In the Moderna trial, the excess risk of serious AESIs (15.1 per 10,000 participants) was higher than the risk reduction for COVID-19 hospitalization relative to the placebo group (6.4 per 10,000 participants)"
- "In the Pfizer trial, the excess risk of serious AESIs (10.1 per 10,000) was higher than the risk reduction for COVID-19 hospitalization relative to the placebo group (2.3 per 10,000 participants)."

70. There is extensive evidence that the spike protein produced in the body as a result of the inducement of the covid vaccine substance into a body causes micro-clotting throughout the body, permanently damaging the recipient's cardiovascular system.

71. Immediately prior to NASB's Covid-19 mandate, Israeli researchers in a large study conducted during the summer of 2021 (and issued in late August 2021) found that "in one of the most highly COVID-19–vaccinated countries in the world, examined medical records of tens of thousands of Israelis, charting their infections,

symptoms, and hospitalizations between 1 June and 14 August, when the Delta variant predominated in Israel" and found natural immunity stronger and longer lasting that that induced by the Pfizer vaccine.[19]

72. NASB viewed Meadows' immunity status as a disability. NASB demanded that this purported immunity disability be remedied by Covid-19 vaccine injections. Ultimately, it was known to NASB at the relevant times that a covid-19 vaccine injected-person did not prevent transmission and would have been as contagious or even more as a non-vaccinated person once they contract the Delta variant[20] – yet conducted itself as though vaccines increased workplace safety by purportedly preventing transmission.

73. The proffered safety hardship espoused by NASB in providing Ms. Meadows a religious accommodation is undocumented, and relies upon hypotheticals and speculation contrary to science.

74. There was no objective, scientific basis for the Bank to argue that vaccine injecting protected against transmission or in not granting Meadows' religious

---

[19] Comparing SARS-CoV-2 natural immunity to vaccine-induced immunity: reinfections versus breakthrough infections Maccabie Healthcare Services (Aug. 25, 2021) ("Israel Study") at 3.
[20] Public Health England (Aug. 6, 2021) at 35; University of Wisconsin Study at 2-3. "Outbreak of SARS-CoV-2 B.1.617.2 (Delta) Variant Infections Among Incarcerated Persons in a Federal Prison — Texas, July–August 2021, at 3 ("During a COVID--19 outbreak in a federal prison involving the highly transmissible SARS-CoV-2 Delta variant, transmission was high among vaccinated and unvaccinated persons … the duration of positive serial test results was similar between these two groups, and infectious virus was cultured from both vaccinated and unvaccinated participants").

exemption such that it would have posed a greater risk or an undue risk to any clients, staff, or fellow employees of contracting COVID-19 from Meadows.

**75.** Upon information and belief, NASB has employed and is employing persons since December 1, 2021, that are not "fully vaccinated" as defined under the NASB Covid-19 Vaccination Policy.

**76.** Upon information and belief, every NASB employee allowed to be employed by NASB since December 1, 2021, without being "fully vaccinated" has not caused NASB any undue hardship.

**77.** And despite the fact that "vaccinated" employees were contracting – and spreading Covid (or Delta and Omicron variants which prior vaccinations had no effect upon) – those employees were not terminated.

**78.** NASB's policies were thus punitive toward religious employees such as Ms. Meadows who should have been accommodated. Many, if not all of them, had natural immunity to the virus and therefore posed an equal or lower risk to others than the vaccinated secular employees who had not previously contracted COVID-19.[21]

**79.** Additionally, religious NASB employees objecting to the vaccine injections were all willing to observe safety practices such as symptomatic mitigation, remote work, masking, and testing. Not only had such measures been adequate for the prior

---

[21] Medically speaking, both vaccinated and unvaccinated individuals posed a risk of virus transmission, though vaccinated individuals realistically posed an even greater risk due to their ability to possess high viral loads while having reduced symptoms.

months of the pandemic (before the NASB policy), mitigation, remote work, and/or testing represented the best means of reducing/preventing COVID-19 transmission for both vaccinated and unvaccinated individuals.[22]

### COUNT I
FAILURE TO ACCOMMODATE
VIOLATION OF ADA & REHAB ACT

**80.** Plaintiff restates the foregoing paragraphs as if set forth fully herein.

**81.** Plaintiff brings this action against Defendant under the Americans with Disabilities Act of 1990, as amended by the ADA Amendments Act of 2008 ("ADA"), 42 U.S.C. §§ 12101 et seq., which incorporates, through 42 U.S.C. § 12117, the powers, remedies, and procedures set forth in Title VII of the Civil Rights Act of 1964, as amended, included in 42 U.S.C. § 2000e et seq., in addition to its implementing Regulations, the Rehabilitation Act of 1973, as amended ("Rehabilitation Act"), 29 U.S.C. §§ 701 et seq.,

**82.** According to the defendant, the plaintiff has a physical or mental impairment that does not substantially limit major life activities but is treated by NASB as constituting such limitation.

---

[22]Since both vaccinated and unvaccinated individuals have a similar risk of virus transmission, testing to ensure lack of infection and/or remote work options, which completely prevent transmission, represent the most effective means of reducing or preventing transmission.

Case 4:22-cv-00790-FJG   Document 1   Filed 11/30/22   Page 23 of 46

**83.** According to the defendant, the plaintiff has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

**84.** Plaintiff has no such impairment but is treated by NASB as having a substantially limiting impairment.

**85.** NASB's vaccine policy considers the plaintiff's medical condition of being "unvaccinated" as a disability.

**86.** NASB terminated the plaintiff because of her perceived disability constituting not having artificially induced immunities to the SARS virus.

**87.** The considered disorder by NASB was a condition concerning Ms. Meadows' functions such as speaking, breathing, learning, and working.

**88.** Defendant discharged the plaintiff.

**89.** Defendant discharged Plaintiff because of this perceived disability.

**90.** There was nothing in the Bank's job description of Meadows' job that required that Meadows have immunities to any disease.

**91.** The Bank implemented a written anti-discrimination policy which prohibits discrimination against employees based on the employee's religion, yet the Bank has discriminated on the basis of religion and disability.

**92.** NASB regarded Ms. Meadows as having a physical impairment that substantially limited her ability to work, based on Defendant's knowledge of her immunity and vaccine status.

**93.** Throughout her employment, Ms. Meadows could perform the essential functions of her job with or without accommodation.

**94.** Plaintiff's case is predicated on direct evidence of disability discrimination and a claim of pretext, i.e., circumstantial evidence.

**95.** Meadows was terminated because the Bank regarded her as disabled in that: the Bank either: (1) as a result of the attitudes of others toward such impairment considered the plaintiff as having a physical or mental impairment that substantially limits major life activities only; (2) was treated by NASB as having a substantially limiting impairment even though Ms. Meadows had no such impairment; or (3) NASB's vaccine policy and actual termination of Ms. Meadows considered her medical condition as not being "fully vaccinated" as disability.

**96.** The Bank's policy and its termination of Ms. Meadows demonstrate that it views employees not "fully vaccinated" as having inferior immune systems. According to the Bank, Meadows' purportedly inferior immune system did not and would not protect other employees sufficiently or as well as her "fully vaccinated" colleagues, irrespective of the time lapse of receiving any vaccine injection, and thus she would be a direct threat to the safety of fellow employees and customers being purportedly more likely to transmit the Covid 19 virus.

**97.** According to the Bank, Meadows' immunity disability significantly restricted Meadows in the ability to perform not merely a particular job but an entire class and broad range of jobs at the Bank.

**98.** Defendant has provided inconsistent explanations for the plaintiff's discharge, including claiming her religious beliefs were insincere, claiming workplace safety when vaccination status is not a work place activity and do not prevent transmission, showing the pretextual nature of Defendant's explanation for discharging Plaintiff.

**99.** Defendant directly caused Plaintiff damages, including economic harm, emotional distress, pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other losses under the aforementioned federal statutes.

**COUNT II**
Violation of Title VII, 42 U.S.C. § 2000e, et seq.
Religious discrimination – disparate treatment

**100.** Plaintiff restates the foregoing paragraphs as if set forth fully herein.

**101.** Plaintiff holds a sincere religious beliefs that precludes her from consenting to Covid-19 vaccine injecting. NASB has speculated as to the sincerity of the plaintiff's beliefs but she provided a set of beliefs that was comprehensive and clear, even if the Bank misconstrued them, did not understand, or want to credit those beliefs.

**102.** Plaintiff informed NASB of those beliefs and requested religious accommodations from the vaccine mandate.

**103.** By requesting religious accommodations from NASB, Plaintiff established herself as a member of a protected class.

26

**104.** Plaintiff's employee records demonstrate unquestionably that she was qualified for the position. That is why, prior to the mandate, the plaintiff had no indication that her job was in jeopardy – indeed, she had been successful for a substantial amount of time prior to the vaccine edict and, absent NASB's unlawful actions, would still be working there.

**105.** Plaintiff suffered an adverse employment action when NASB threatened to suspend her pay and then terminated her after she declined – on religious grounds – to consent to multiple injections of a COVID-19 vaccine.

175. At the same time, others at the Bank were provided accommodations from the vaccine mandate for secular reasons and not terminated.

**106.** NASB contends that Ms. Meadows cannot be sincere because while Ms. Meadows objected to this vaccine for reasons including it being tested using fetal cells, it claims Pfizer and Moderna don't contain fetal cells – which misses the point about the connection to fetal testing. NASB also raised in its EEOC response that Ms. Meadows didn't comment on her immunization history which is irrelevant.

**107.** NASB's questions on immunization history ignore the fact that children don't consent to vaccine injecting. As to anything done as an adult, NASB's questions also did not ask for information about Ms. Meadows' knowledge about any particular vaccine. The question to a religious practitioner is not whether some substance was injected into her body but rather whether the practioner understood or knew the substance contained fetal cells or was tested using such. And in any event that was

not the reason why NASB rejected Ms. Meadows' religious accommodation request according to the NASB rejection notice.

**108.** By denying her religious exemption to the mandatory COVID-19 vaccination policy which required the plaintiff to consent to multiple vaccine injections and then terminating her employment, the defendant violated Meadows' rights under Title VII.

**109.** Title VII provides, inter alia, that "[i]t shall be an unlawful employment practice for an employer … to discharge any individual … because of such individual's … religion …." 42 U.S.C. § 2000e-2(a)(1). Title VII further defines "religion" to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."

**110.** Accordingly, under Title VII it is unlawful "for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of her employees…." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977); *see also Ansonia Bd. of Educ. v. Philbrook,* 479 U.S. 60, 68 (1986) ("The employer violates the statute unless it 'demonstrates that [it] is unable to reasonable accommodate … an employee's … religious observance or practice without undue hardship on the conduct of the employer's business.'") (quoting 42 U.S.C. § 2000e(j)).

**111.** Defendant was recklessly indifferent to Meadows' federally protected rights.

112. And at the same time NASB was discriminating against the plaintiff, the Bank knew that vaccinated employees were regularly contracting and spreading COVID-19.

113. Prior to its Covid-19 vaccine enforcement date, NASB was able to efficiently provide any services provided by the plaintiff to any customer or fellow employee.

114. NASB was able to efficiently provide any requested services by a customer while providing a religious accommodation to Ms. Meadows' religious convictions.

115. Ms. Meadows' work was outstanding, and she had no performance issues throughout her employment with Defendant.

116. NASB was not committing any OSHA workplace safety violations in permitting Ms. Meadows to be employed and interact with customers and co-employees prior to the effective date of NASB's Covid-19 vaccine policy.

117. NASB would not have committed any OSHA workplace safety violations in permitting Ms. Meadows to be employed unvaccinated and interact with customers and co-employees after the effective date of NASB's Covid-19 vaccine policy.

118. NASB did not act in good faith in any interactive communication process.

119. NASB did not conduct a reasonable investigation into the plaintiff's immunity status, whether she had similar or greater immunity to a Covid-19 virus as compared to a vaccine injected employee having artificially induced temporary immunities.

**120.** NASB did not require employees to report events in which a customer complained or was turned away because of the NASB's employee's immunity or vaccine status prior to effective date of NASB's Covid-19 policy.

**121.** NASB did not conduct a reasonable investigation into whether requiring Ms. Meadows to be Covid-19 vaccine injected would prevent the transmission of the Covid-19 virus prior to her termination.

**122.** It was not an undue hardship upon NASB to provide Ms. Meadows a religious accommodation in performing of her essential functions as an employee of NASB.

**123.** Allowing Ms. Meadows to work unvaccinated until December 1, 2021, did not increase the use or claim of employee sick days for that period of time.

**124.** In fact, there were vaccinated NASB employees that took sick leave because of a self-reported or diagnosed Covid-19 infection prior to December 1, 2021, and afterwards.

**125.** NASB has no documentation that its vaccination policy reduced the spread of Covid-19 infections or reduced the number of sick days taken by an employee self-reporting or diagnosed with a Covid-19 infection.

**126.** NASB has no documentation as to any customers, their number, or dollar amount in sales being lost or reduced by allowing Ms. Meadows' to be employed at her position prior to the effective date of NASB's vaccination requirement.

127. NASB has no documentation as to any customers, their number, or dollar amount in sales being gained as a result of terminating Ms. Meadows' employment at NASB.

128. After Ms. Meadows was terminated, NASB has no documentation showing that there was any reduction in an employee's use of sick days, or health insurance claims arising from a Covid-19 infection.

129. While Ms. Meadows was employed, NASB has no documentation that it was required to hire additional employees or any staff as a direct result of allowing Ms. Meadows to be employed during the time period of NASB's Covid-19 vaccine policy enactment through December 1, 2021, when Ms. Meadows was terminated.

130. NASB has no documentation that demonstrates NASB was required to rearrange staffing or incur additional costs during the time period of NASB's Covid-19 vaccine policy enactment through December 1, 2021, the date when Ms. Meadows was terminated.

131. Allowing Ms. Meadows to work unvaccinated through December 1, 2021, did not cause employee sicknesses, disruptions, jeopardize safety, cause other employees to work longer hours, nor did it cause NASB to lose any customer traffic.

132. NASB conducted no studies or analysis yielding any documentation that allowing Ms. Meadows to work unvaccinated through December 1, 2021, caused or increased employee sicknesses, disruptions, safety risks, or caused or contributed to other employees being required to work longer hours.

**133.** NASB was not required to hire any additional workers nor did it suffer the loss of production because of allowing Ms. Meadows to work unvaccinated through December 1, 2021.

**134.** Since terminating Ms. Meadows and replacing her with another employee at the same position, NASB has no evidence of any loss or gain of customer satisfaction, store traffic, or profits associated with terminating Ms. Meadows' employment and replacing her with a vaccinated employee.

**135.** NASB has no evidence of any loss or increase in market share, customer loyalty, or store traffic due to accommodating or not accommodating the religious beliefs of a an employee at any time.

**136.** Similarly, NASB has no evidence of an increase in customer satisfaction, Bank traffic, or profits associated with not providing religious accommodations to NASB employees since December 2021.

**137.** Even engaging in the invented idea that vaccine injections hindered transmission, in NASB's policy it admits it can accommodate religious requests by "wearing of personal protective equipment (including but not limited to masks and/or other face coverings), changes to the nature of the job duties performed by the employee, reassignment, or other conditions." Yet in the interactive process and determination, NASB did not consider those accommodations for Ms. Meadows.

**138.** The fact is NASB adopted a process that does not even permit the possibility of approval for a religious accommodation because NASB predetermined that anyone

unvaccinated for religious reasons would present a workplace safety issue that could not be accommodated.

**139.** All this evidences pretext on the part of NASB since the Bank has proffered an undue hardship explanation that is "unworthy of credence" – it is "apparent that unlawful discrimination was more likely the employer's motivation." *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

**140.** Religious employees who were willing to participate in safety measures such as symptomatic reporting, remote work, masking, and testing and/or who had natural immunity were terminated; secular employees who were induced with waning artificial immunities (even those immunized with an incomplete vaccine series providing arguably inferior immunization) were allowed to keep their jobs, as were secular employees with medical excuses not to take the vaccine.

**141.** NASB's policies were thus punitive toward religious employees such as the plaintiff who should have been accommodated. Many, if not all of NASB employees, developed some sort of natural immunity to the Sars virus and therefore posed an equal or lower risk to others than the vaccinated secular employees who had not previously contracted COVID-19.

**142.** Additionally, the plaintiff was willing to observe mitigation practices such as self-reporting of symptoms, remote work, masking, and testing. Not only had such measures been adequate for the prior 18 months of the pandemic, self-reporting, remote work and/or testing represented the most efficient means of

33

reducing/preventing COVID-19 transmission for both vaccinated and unvaccinated individuals during workplace hours.

143. Yet NASB treated religious employees worse because of their religious objection to the vaccine. (NOTE: A truly preventative policy would have required something such as regular testing for all employees, especially those who had not previously recovered from a COVID-19 infection even if they were vaccinated.)

144. In other words, NASB required naturally immune religious employees to possess hybrid immunity (vaccine-based immunity + natural immunity (which studies demonstrated may actually reduce the totality and length of immunity)) and subjected them to heightened protocols in the name of workplace safety because of their religious beliefs. At the same time, NASB rewarded secular vaccinated employees, even though they presented an equal or greater contagion hazard relative to religious naturally immune employees, because NASB favored those employees' views on COVID-19 vaccines.

145. Moreover, the Bank enforced its policy with the full knowledge and with intent to adversely affect religious employees disproportionately. Indeed, instead of implementing plans to accommodate religious employees, NASB implemented discriminatory policies and created a questionnaire design to assist the Bank in denying religious exemption requests. It is believed that after denying 100% of religious exemption requests, the Bank cannot now argue that the accommodations process was actually instituted in good faith.

**146.** NASB never planned to provide the plaintiff a reasonable accommodation and its supposed "interactive process" sought only to gain information it might later be able to use against this plaintiff who deigned to push back on the Bank's unlawful actions. NASB subjected the plaintiff to its sham process, seeking information about people's beliefs, personal information, and medical histories even though the Bank never planned to accommodate them anyway. This all took place because of this plaintiff's religious beliefs and they would not have had to undergo that process but for their sincerely held religious beliefs about the COVID-19 vaccine.

**147.** NASB plainly did not want religious requests to succeed and purposefully plotted to deny those requestors.

**148.** Any non-discriminatory reason proffered by NASB – such as increased safety – was pretextual. By allowing vaccinated employees to avoid necessary preventative measures like testing, while not even allowing exempt employees like the plaintiff to use them, the Bank has undermined any legitimate nondiscriminatory reason it might have tried to claim as it relates to workplace safety. Moreover, as the evidence shows, the OSHA-Workplace-safety legal and factual rationale for treating unvaccinated employees differently (especially those with natural immunity) was non-existent long before NASB put religious employees out of work here. At all relevant times, it was abundantly clear that these "vaccines" were not preventing transmission of the virus. And added to the above, once the Omicron variant swept across the country, more evidence existed contradicting NASB's policy as no vaccine served as a means to even reduce symptoms and certainly as any means to hinder

transmission. It was thus unlawful to discriminate against religious employees such as Meadows.

149. If NASB's justification truly was to help provide for a safe work environment during the COVID-19 pandemic, the Bank would not have chosen a Covid-19 vaccine requirement as a solution or singled out those who had natural immunity and/or were willing to submit to self-reporting, or testing for worse treatment because they could not take the vaccine for religious reasons.

150. The OSHA workplace safety argument was clearly a pretext on nearly every level. NASB's purposeful attack on religious beliefs is made apparent by NASB's failure to investigate, its disregard of law and science, or its willful ignorance of the science and the CDC's guidance in March, July, and August of 2021, establishing that the vaccines would never prevent or even reduce Covid virus transmission.

151. Considering these factors, a strong inference of intentional religious discrimination exists, and any non-discriminatory reason asserted by NASB is inauthentic.

## COUNT III
Violation of Title VII, 42 U.S.C. § 2000e, et seq.
Religious discrimination—failure to accommodate

152. Plaintiff restates the foregoing paragraphs as if set forth fully herein.

153. Plaintiff holds a sincere religious beliefs that precludes her from consenting to a COVID-19 vaccine. Indeed, her beliefs were sincere enough to cause her to accept termination from a career she enjoyed rather than betray her beliefs.

154. Plaintiff informed NASB of those beliefs and requested religious accommodations from its vaccine mandate.

155. NASB refused to engage in an actual interactive process with the plaintiff regarding her religious accommodation request and instead only responded to Ms. Meadows with questions (or other coercion) designed to deter her from exercising their religious beliefs.

156. NASB did not bother engaging in a true interactive process with religious accommodation seekers such as the plaintiff because it never intended to provide her with a reasonable accommodation.

157. Irrespective of the interactive process, NASB failed to provide the plaintiff with reasonable accommodations for her religious beliefs.

158. In fact, NASB failed to consider reasonable accommodations (such as self-reporting of symptoms, masking, testing, and natural immunity) because it never intended to accommodate religious employees and was only interested in coercing them to take the vaccine.

159. If the military, vaccine manufacturers or other employer banks can provide reasonable religious accommodations to Covid-19 injections, then NASB could have done so as well.

160. The Bank's attempts to dodge providing reasonable accommodations by casting aspersions on Plaintiff's religious objections to the vaccine fail on their face. The plaintiff detailed her sincerely held religious beliefs only to be rejected when the Bank

37

claimed to the EEOC that she had not shown a satisfactory basis for an accommodation on religious grounds. This position is post hoc and was a sham, however, since the denial was predetermined before the request was made as part of a pattern of discrimination against those unable to consent to COVID-19 vaccine injections because of their sincerely held religious beliefs.

161. The rejections of the plaintiff's beliefs were simply transparent rejections of religion as a suitable reason not to become one of "the vaccinated." NASB did not welcome religious requests and determined as a result not to accept religious exemption requests. The canned denial letters that failed to grapple with any requestor's requests are further proof that the Bank did not treat religious requests in good faith align with the Bank's overall pattern of discrimination.

162. NASB thereby discriminated against the plaintiff because of her religious beliefs.

163. NASB's failure to provide religious accommodations has harmed and will continue to harm this plaintiff.

164. By failing to engage in a true interactive process or offer any reasonable accommodation, NASB's discriminatory actions were intentional and/or reckless and in violation of Title VII.

**COUNT IV**
Violation of Title VII, 42 U.S.C. § 2000e, et seq.
Religious discrimination—retaliation

165. Plaintiff restates the foregoing paragraphs as if set forth fully herein.

38

**166.** Plaintiff engaged in protected activity when she requested religious accommodations from NASB's vaccine mandate.

**167.** As with other religious employees, NASB responded with improper questioning of the plaintiffs' religious beliefs aimed at forcing her to acquiesce while having prepared a legal defense against her Title VII rights ahead of time.

**168.** The Bank also subjected religious employees such as Ms. Meadows to unwanted coercion and other tactics aimed at punishing their beliefs and making them regret requesting an accommodation based on religious grounds.

**169.** Ms. Meadows was threatened with unpaid leave and termination if she did not comply with NASB's mandate.

**170.** The "choice" NASB has given religious employees such as Ms. Meadows "has created a crisis of conscience, pressuring them to abandon their religious commitments. By threatening termination, [NASB] has enlisted employees and their families in the project of reforming employees' religious commitments. Putting employees to this coercive choice imposes a distinct and irreparable harm beyond lost pay, benefits, seniority, and other tangible and remediable losses." *See Sambrano*, 19 F.4th at 842 (Ho, J., dissenting) ("To hypothesize that the earthly reward of monetary damages could compensate for these profound challenges of faith is to misunderstand the entire nature of religious conviction at its most foundational level").

**171.** This coercion was a concerted effort from NASB management—a fact the Bank did not attempt to conceal.

**172.** Finally, NASB terminated the plaintiff as a result of her request for a religious exemption. Had she sought a medical exemption, she would have been subject to neither the ongoing coercion nor termination.

**173.** Plaintiff's religious beliefs and protected activity were the causes of NASB's adverse employment action.

**174.** By retaliating against the plaintiff for engaging in protected activity, NASB violated Title VII. This violation has harmed and continues to harm the plaintiff.

**COUNT V**
Violation of Title VII, 42 U.S.C. § 2000e, et seq.
Religious discrimination—disparate impact

**175.** Plaintiff restates the foregoing paragraphs as if set forth fully herein.

**176.** Plaintiff holds a sincere religious beliefs that precludes her from consenting to a COVID-19 vaccine. Indeed, her beliefs were sincere enough to cause her to accept termination from a career she enjoyed rather than betray her beliefs.

**177.** Plaintiff informed NASB of those beliefs and requested religious accommodations from the vaccine mandate, thus identifying herself to the Bank as part of a protected class.

**178.** NASB's mandate had an adverse effect on the plaintiff unable to consent to a COVID-19 vaccine injection for religious reasons.

**179.** It is believed that one hundred percent of those unable to consent to having the vaccine injection for religious reasons were terminated, confirming its disparate impact on that protected group.

**180.** This violation of Title VII has harmed and continues to harm the plaintiff.

## PRAYER FOR RELIEF AS TO ALL FEDERAL COUNTS

WHEREFORE, the plaintiff requests that the Court:

a. Declare that NASB has violated Title VII by discriminating against employees seeking religious accommodations to its COVID-19 vaccine mandate, disfavoring their exemption requests because they were based on religious reasons rather than secular ones.

b. Declare that NASB has violated Title VII by failing to engage in a good-faith interactive process and provide reasonable accommodations in response to requests for religious accommodations to its COVID-19 vaccine mandate.

c. Declare that NASB has violated Title VII by retaliating against employees who engaged in protected activity.

d. Declare that NASB's vaccine mandate—with no accommodations for religious employees—had a disparate impact on those unable to take a COVID-19 vaccine for religious reasons.

a. Award Plaintiff nominal and actual damages including:

i. Termination or employee misconduct contained in her personnel file;

ii. Deterioration in job skills;

   iii.Lost bonus pay;

   iv.Lost seniority;

    v.Loss of preferential shifts and other adverse impacts on working conditions;

   vi.Loss of wages;

  vii.Extreme stress and anxiety and;

 viii.Attorney fees and costs.

     Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a jury trial on all issues upon which there is a federal right to a jury trial.

## COUNT VI
### Missouri Human Rights Act

**181.** Plaintiff restates the foregoing paragraphs as if set forth fully herein.

**182.** Plaintiff was an "employee" of Defendant for purposes of The Missouri Human Rights Act.

**183.** Plaintiff is a "person" as defined by R.S.Mo. § 213.010(15).

**184.** Throughout her employment, Plaintiff could perform the essential functions of her job with or without accommodation.

**185.** Plaintiff filed a Charge of Discrimination with the Missouri Commission on Human Rights, alleging Defendant discriminated against her.

**186.** The MCHR issued the plaintiff a right-to-sue notice.

**187.** NASB has violated MCHR by discriminating against this employee seeking religious accommodations to its COVID-19 vaccine mandate, disfavoring her

exemption requests because they were based on religious reasons rather than secular ones.

**188.** NASB has violated MCHR by failing to engage in a good-faith interactive process and provide reasonable accommodations in response to requests for religious accommodations to its COVID-19 vaccine mandate.

**189.** NASB has violated MCHR by retaliating against this employee who engaged in protected activity.

**190.** NASB's vaccine mandate—with no accommodations for religious employees—had a disparate impact on those unable to take a COVID-19 vaccine for religious reasons under the MCHR.

WHEREFORE, the plaintiff prays for judgment finding Defendant liable for this Count and awarding the plaintiff actual and punitive damages in an amount that is fair and reasonable, costs, interest, reinstatement, all other relief the Court may grant.

**COUNT VII**
Disability Discrimination
(R.S.Mo. § 213.055)

**191.** Plaintiff restates the foregoing paragraphs as if set forth fully herein.

**192.** Plaintiff had a disability for purposes of the Missouri Human Rights Act.

**193.** Defendant discharged Plaintiff.

**194.** Defendant discharged Plaintiff because of her disability.

**195.** There was nothing in the Bank's job description of Meadows' position that required that Meadows have immunities to any disease or to obtain immunities to any disease.

**196.** In fact, the Bank promised not to discriminate against Meadows on the basis of religion in that the terms of employment. The bank implemented a written anti-discrimination policy which prohibits discrimination against employees based on the employee's religion,

**197.** The Bank's actions discriminated against Meadows' disability and her religion.

**198.** The MHRA defines "disability" as a:

> physical or mental impairment which substantially limits one or more of a person's major life activities, being regarded as having such an impairment, or a record of having such an impairment, which with or without reasonable accommodation does not interfere with performing the job, utilizing the place of public accommodation, or occupying the dwelling in question.

Section 213.010(4). Employment is a "major life activity" included in MHRA disability discrimination protections. See 8 CSR 60-3.060(1)(C).

**199.** During Plaintiff's employment with Defendant, she was a person with a "disability" as defined by R.S.Mo. § 213.010(5), in that Defendant regarded Plaintiff as having a physical impairment that substantially limited her ability to work, based on Defendant's knowledge of Plaintiff's immunity and vaccine status.

**200.** Throughout her employment, Plaintiff could perform the essential functions of her job with or without accommodation.

**201.** Meadows was terminated because the Bank regarded her as disabled in that: the Bank either: (1) wrongly believed that she had an impairment that substantially limited one or more major life activities or (2) wrongly believed that an actual, non-limiting impairment substantially limited one or more major life activities.

**202.** The Bank's actions show that it views un-vaccinated employees as having inferior immune systems. According to the Bank, Meadows' purportedly inferior immune system did not protect other employees sufficiently or as well as her vaccinated colleagues and thus she would be more likely to transmit the Covid 19 virus. That is a perceived disability protected against discrimination in the workplace.

**203.** According to the Bank, Meadows, because of her immunity status, she was substantially limited in performing a major life activity for purposes of the MHRA because, according to the Bank, she was unable to perform or significantly restricted as to the condition, manner or duration under which she could perform a particular major life activity.

**204.** According to the Bank, Meadows' immunity disability significantly restricted Meadows in the ability to perform not merely a particular job but an entire class and broad range of jobs at the Bank.

**205.** Defendant has provided inconsistent explanations for the plaintiff's discharge, including claiming her religious beliefs were insincere, claiming workplace safety

when vaccination status is not a work place activity and do not prevent transmission, showing the pretextual nature of Defendant's explanation for discharging Plaintiff.

**206.** Defendant directly caused Plaintiff damages, including economic harm, emotional distress, pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other losses including the deprivation of Plaintiff's civil rights under Missouri law.

**207.** The actions and conduct set forth herein demonstrate a reckless indifference or conscious disregard for the rights of Plaintiff and others

WHEREFORE, prays for judgment finding Defendant liable for this Count and awarding Plaintiff actual and punitive damages in an amount that is fair and reasonable, costs, fees, expenses, interest, reinstatement, all other relief the Court may grant.

## JURY TRIAL DEMAND

PLAINTIFF HEREBY REQUESTS A JURY TRIAL

By:/s/Linus L. Baker
Linus L. Baker MO 44980
6732 West 185th Terrace
Stilwell, Missouri 66085-8922
913.486.3913
913.232.8734 (fax)
E-Mail: linusbaker@prodigy.net
Attorney for the plaintiff